**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | | |
|---|---|---|
| **JANICE PIGOTT,** *et al.,* | ) | |
| | ) | |
| **Plaintiffs,** | ) | **PUBLISH** |
| | ) | |
| **v.** | ) | **CIVIL ACTION 07-0083-WS-C** |
| | ) | |
| **SANIBEL DEVELOPMENT, LLC,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**ORDER**

This matter comes before the Court on Plaintiffs' Motion for Partial Summary Judgment (doc. 79), Defendant's Motion for Summary Judgment (doc. 81), and Plaintiffs' Motion to Strike (doc. 93).  The Motions have been briefed and are ripe for disposition.

**I.     Nature of the Case.**

This action is an amalgamation of four consolidated civil actions, spanning eight plaintiffs with substantially similar claims against defendant, Sanibel Development, LLC.[1] Those eight plaintiffs - Janice Pigott, Kimberly Barnes, Christopher Barnes, Cynthia Priolet, Phillipe Priolet, Susan Hersey, Richard Taylor, and Steven Martino - all contracted with Sanibel in spring 2005 to purchase condominium units at a high-rise beachfront development known as Sanibel, a Condominium, which lies between the Gulf of Mexico and Little Lagoon in Gulf Shores, Alabama.  More specifically, Pigott and the Barneses contracted with Sanibel to purchase Units 204 and 205 of the project; Hersey contracted with Sanibel to purchase Unit 1005; the Priolets contracted with Sanibel to purchase Unit 1105; and Taylor and Martino

---

[1]     The constituent actions are as follows: *Janice Pigott, et al. v. Sanibel Development, LLC*, Civil Action 07-0083-WS-C; *Cynthia Priolet, et al. v. Sanibel Development, LLC*, Civil Action 07-0090-C; *Richard Taylor, et al. v. Sanibel Development, LLC*, Civil Action 07-0185-WS-C; and *Sanibel Development, LLC v. Cynthia Priolet, et al.*, Civil Action 07-0691-WS-C (which in turn was the product of three consolidated declaratory judgment actions filed by Sanibel in the Circuit Court of Baldwin County, Alabama, prior to removal by Christopher Barnes, Kimberly Barnes, Janice Pigott, Cynthia Priolet, Phillippe Priolet, and Susan Hersey).

contracted with Sanibel to purchase Unit 1106.  In accordance with the terms of their purchase agreements, plaintiffs furnished Sanibel with substantial letters of credit and/or cash deposits to be held in escrow as security for plaintiffs' performance of their obligation to close on the units.[2]

All eight plaintiffs now seek to rescind their purchase agreements with Sanibel and to recover the earnest money funds paid in connection with those agreements.  Plaintiffs contend that their right of rescission arises under the Interstate Land Sales Full Disclosure Act, 15 U.S.C. §§ 1701 *et seq.* ("ILSFDA" or the "Act"), based on Sanibel's failure to provide plaintiffs with disclosures in the form of a printed property report.  The critical legal question presented by the parties' cross-motions for summary judgment is whether the Sanibel project is subject to, or exempt from, the Act's disclosure requirements.  If the Sanibel project is not exempt, then all eight plaintiffs are entitled to revoke their purchase agreements, and Sanibel is obligated to return their cash deposits and letters of credit to them.  On the other hand, if the project is exempt, then plaintiffs have forfeited their earnest money deposits and letters of credit by refusing to close on their purchase agreements with Sanibel in a timely manner.

In addition to the ILSFDA property report cause of action interposed by all plaintiffs, six plaintiffs (Pigott, the Barneses, the Priolets, and Hersey) have asserted ILSFDA fraud claims against Sanibel, for which they seek rescission of the purchase agreements, return of earnest money/letters of credit, damages, and other relief.  (*See* docs. 53, 54.)  In particular, Pigott and the Barneses allege that Sanibel "represented to [them] that they were purchasing Unit 204 of Sanibel directly from the Defendant at a preconstruction price when in fact Unit 204 was under contract to be sold to a third party."  (Doc. 53, ¶ 26.)[3]  Similarly, the Priolets and Hersey assert

---

[2]      These cash deposits and letters of credit were in the amount of 20% of the total purchase price, and were in amounts exceeding $100,000 for each such unit.  Thus, Pigott and the Barneses posted $24,080 in checks and $79,800 via letter of credit for Unit 204, as well as a letter of credit in the amount of $122,600 for Unit 605.  Hersey deposited a letter of credit and earnest money in the amount of $105,800 for Unit 1005.  The Priolets deposited a letter of credit and earnest money in the amount of $106,000 for Unit 1105.  And Taylor and Martino procured a letter of credit in the amount of $105,800 for Unit 1106.

[3]      During summary judgment briefing, these three plaintiffs acknowledged that Sanibel is entitled to judgment as a matter of law on their fraud claim.  In particular, plaintiffs state as follows: "Based on the evidence produced in discovery, Plaintiffs Janice Pigott,

that they were defrauded because they "believed and it was represented to them that they were making an Offer on a pre-development unit of Sanibel Condominiums," when in fact such was not the case.  (Doc. 54, ¶¶ 36, 48.)

All of plaintiffs' ILSFDA causes of action (including both the disclosure-related claims and the fraud-based claims) arise pursuant to 15 U.S.C. § 1709(a), which creates a private right of action for purchasers against developers who fail to comport with the disclosure and anti-fraud provisions of the Act.

All parties move for summary judgment on the ILSFDA disclosure issue, which hinges on the legal question of whether (based on material facts that are undisputed) the Sanibel project was or was not exempt from the Act's property report requirement.  Additionally, Sanibel seeks summary judgment on the fraud causes of action, while plaintiffs Hersey and the Priolets contend that genuine issues of material fact necessitate that their fraud claims be decided at trial.

## II.    Background Facts.[4]

### A.    *The Sanibel Project.*

The salient facts concerning the structure of the Sanibel project (the "Project") are both straightforward and undisputed.  All parties agree that the Project is a recently-completed high-rise condominium development in Gulf Shores, Alabama, comprised of 108 residential units. Defendant, Sanibel Development, LLC, was the developer of the Project.  All parties agree (and Sanibel, in particular, concedes) that the Project was not registered with the U.S. Department of Housing and Urban Development ("HUD") under the ILSFDA.  (Doc. 81-2, ¶ 9.)  All parties agree (and Sanibel again admits) that Sanibel neither prepared the property report that the

---

Kimberly Barnes and Christopher Barnes cannot prove their fraud claim found in Count II of their Amended Complaint.  (Doc. 53)  Therefore, these Plaintiffs consent to a judgment dismissing Count II of their Amended Complaint only."  (Doc. 94, at 18 n.13.)  On that basis, Sanibel's Motion for Summary Judgment is **granted** with respect to this claim, and Count II of the Amended Complaint brought by Pigott, Barnes and Barnes is **dismissed**.

[4]      The Court is mindful of its obligation under Rule 56 to construe the record, including all evidence and factual inferences, in the light most favorable to the nonmoving party. *See Skop v. City of Atlanta, GA*, 485 F.3d 1130, 1136 (11th Cir. 2007).  Thus, with respect to each motion for summary judgment, the nonmovant's evidence is taken as true and all justifiable inferences are drawn in its favor.

ILSFDA requires with respect to certain condominium developments, nor furnished copies of any such property report to the eight plaintiffs in this action at any time. (*Id.*, ¶¶ 10-11.)[5]

**B.     The Purchase Agreements.**

All plaintiffs entered into substantially identical Purchase Agreements and Escrow Agreements with Sanibel for particular units of the Project in the spring of 2005, well before the Project had been built.

On February 23, 2005, Pigott and the Barneses jointly entered into a Purchase Agreement and Escrow Agreement with Sanibel to purchase Unit 204 of the Project for the total purchase price of $519,900. (Doc. 79, Exh. A.)[6] Several months later, on May 18, 2005, those same three plaintiffs entered into a Purchase Agreement and Escrow Agreement with Sanibel to purchase Unit 605 of the Project for the total purchase price of $613,000. (Doc. 79, Exh. B.)[7] These Agreements obligated Pigott and the Barneses to pay a 20% earnest money deposit in the form of an irrevocable bank letter of credit or, alternatively, a cash deposit, to be held in escrow pending the closing. (*Id.*, ¶ 3.) The Agreements also provided that Sanibel was undertaking to construct the Project, with completion anticipated within two years. (*Id.*, ¶ 5.) Closing of the sale and delivery of the unit were to occur within 30 days following completion of construction, with the

---

[5]     Even if defendant had not made admissions on these points, the summary judgment record unambiguously confirms the veracity of those statements. In particular, plaintiffs have submitted uncontroverted affidavits confirming that none of them ever received a property report from Sanibel or anyone else in connection with their purchase of Project units. (Hersey Aff., ¶ 4; C. Priolet Aff., ¶ 5; Taylor Aff., ¶ 6; Pigott Aff., ¶ 5; K. Barnes Aff., ¶ 7.) Thus, as a matter of both admission and affirmative evidence, there is no question that Sanibel failed to provide plaintiffs with an ILSFDA property report at any time before or after their execution of purchase agreements.

[6]     The Court understands that plaintiff Christopher Barnes denies the authenticity of the signature on the Purchase Agreement for Unit 204 purporting to be his. (K. Barnes Aff., ¶ 3.) As the parties have not raised the issue in their briefs, the authenticity of Mr. Barnes' signature is not at issue for summary judgment purposes.

[7]     An Addendum to Purchase Agreement dated August 30, 2006 reflects that the parties to the Unit 605 agreement subsequently negotiated a lower price, with the Addendum stating that the new purchase price would be $550,000, or some $63,000 below the originally agreed-upon sum. (*Id.*) That subsequent modification is of no consequence for purposes of the pending cross-motions for summary judgment.

purchasers expressly agreeing to close within such 30-day period.  (*Id.*)  The Agreements further provided that if purchasers failed to perform their contractual obligations, Sanibel would be entitled to terminate the Agreements, "whereupon the earnest money and all interest earned thereon (if any) shall be immediately paid to [Sanibel] as fixed and full liquidated damages." (*Id.*, ¶ 14(b).)

On March 17, 2005, Hersey entered into a Purchase Agreement and Escrow Agreement with Sanibel to purchase Unit 1005 of the Project for the sum of $529,000.  (Doc. 79, Exh. D.)[8] The terms of the Hersey agreement were substantially identical in all material respects to those of the Pigott/Barnes agreements.  However, Unit 1005 had a hidden history.  Unbeknownst to Hersey, Sanibel had previously sold it to someone else for a much lower price.[9]  In particular, the record reflects that on November 23, 2004, non-parties Tommy and Sheena Byrd had entered into a Purchase Agreement with Sanibel to purchase Unit 1005 for $329,000, which is $200,000 less than the amount that Hersey agreed to pay four months later.  (Doc. 79, Exh. J.)[10]  The record also includes an undated document styled "Agreement to Cancel Contract and Return of Earnest Money Deposit," wherein Sanibel released the Byrds from their agreement to purchase Unit 1005, returned their earnest money deposit to them, and promised to pay them "the approximate sum of $200,000" upon the closing of the Hersey sale of that same unit.  (*Id.*) Sanibel has no disclosure statements or documentation showing that Hersey or her agent was ever apprised of the arrangement between Sanibel and the Byrds for Unit 1005.  (Hirras Dep., at

---

[8]     Hersey and the Priolets maintain that Sanibel never validly accepted their purchase offers; however, that issue is not before the Court on summary judgment and will not be considered at this time.  (Doc. 79, at 3 n.2.)

[9]     The Court is cognizant that Sanibel disputes the state of Hersey's knowledge concerning the prior sale.  As to this issue, however, Sanibel is the movant and Hersey is not; therefore, these facts are presented in the light most favorable to Hersey for summary judgment purposes.  The same goes for the Priolets' analogous claims, discussed *infra*.

[10]     Sheena Byrd was an employee of Visions Real Estate.  (Hirras Dep., at 125.) Visions Real Estate was the listing agent and sales file manager for the Project, and was in charge of handling or coordinating sales for the Project.  (*Id.* at 19-20; doc. 79, Exh. G, at #7.) Thus, Byrd worked for the realtor that was selling units of the Project on Sanibel's behalf. Sanibel knew that the Byrds intended to resell Unit 1005 at the time the unit was sold to them. (Hirras Dep., at 127.)

69, 127.)  Moreover, Hersey testified in her deposition that "[n]o one ever informed [her] it was a flip" until well after she had signed the Purchase Agreement and paid the 20% deposit. (Hersey Dep., at 42.)[11]

The Priolets were in a similar position to Hersey.  On April 14, 2005, the Priolets executed a Purchase Agreement and Escrow Agreement with Sanibel, containing the same basic terms as the other agreements described herein.  The Priolets agreed to purchase Unit 1105 for the total purchase price of $530,000.  (Doc. 79, Exh. D.)[12]  But Sanibel had previously sold Unit 1105 to Matthew Quantz for the sum of $329,000 via Purchase Agreement dated November 4, 2004.  (Hirras Dep., Exh. 19.)[13]  The summary judgment record reflects that on April 14, 2005, the very same day that the Priolets agreed to buy Unit 1105 from Sanibel, Sanibel entered into an "Agreement to Substitute Contract and Return Earnest Money Deposit" with Quantz, such that Sanibel released Quantz from his obligation to purchase Unit 1105 and promised to pay him $201,000 when the Priolet sale closed.  (*Id.*)  As with the Hersey agreement, Sanibel has no written disclosures or other documentation reflecting that the Priolets were notified of the Quantz arrangement at the time they agreed to purchase Unit 1105.  (Hirras Dep., at 135-36.) Further, Cynthia Priolet testified that she and her husband were first apprised of Sanibel's arrangement with Quantz for Unit 1105 well after they had signed the Purchase Agreement and paid their earnest money deposit.  (C. Priolet Dep., at 11-12.)

Finally, plaintiffs Taylor and Martino entered into a substantially similar Purchase

---

[11]    Remarkably, Hersey's evidence is that she had direct dealings with Sheena Byrd at Visions Real Estate after Hersey encountered financial difficulty and became unable to cover the carrying costs of her letter of credit on Unit 1005.  (Hersey Dep., at 36-37, 40.)  Byrd followed up a lengthy telephone conversation with Hersey by sending her a letter offering Visions' assistance in reselling Unit 1005, and suggesting a listing price of $649,000.  (*Id.* at Exh. 6.)  At no time during those dealings did Byrd disclose to Hersey her direct involvement and direct financial interest in the sale of Unit 1005 to Hersey.  (*Id.* at 36-37.)  That said, neither Visions nor Byrd is a party to this action.

[12]    Like the Unit 605 agreement, the Priolets' agreement to purchase Unit 1105 was later renegotiated to a lower price.  In particular, an Addendum to Purchase Agreement executed by the Priolets on April 5, 2006 reduced the purchase price to $519,000.  (*Id.*)

[13]    According to defendant's 30(b)(6) deponent, Quantz is the son of Stephen Quantz, a principal of Sanibel.  (Hirras Dep., at 15, 135.)

Agreement and Escrow Agreement with Sanibel on or about March 8, 2005 to purchase Unit 1106 of the Project for the total purchase price of $529,000.  (Doc. 79, Exh. E.)[14]

     **C.**     ***The Attempted Rescissions.***

In late 2006 or early 2007, all eight plaintiffs, by and through counsel, sent letters to Sanibel purporting to revoke their Purchase Agreements and demanding refund of their letters of credit and/or cash deposits.[15]  Specifically, Hersey sent a letter to Sanibel dated October 25, 2006 purporting to revoke her Purchase Agreement on the grounds that Sanibel had not formally accepted her offer to purchase Unit 1005 and Sanibel had misrepresented the transaction by failing to inform her about the Byrds' interest in that unit.  (Doc. 79, Exh. F.)  On October 31, 2006, the Priolets sent a letter to Sanibel purporting to revoke their Purchase Agreement on the grounds that they had not received an acceptance of their offer to purchase Unit 1105 and that the seller's identity had been misrepresented to them as being Sanibel rather than Quantz.  (*Id.*) Neither the Hersey letter nor the Priolet letter mentioned the ILSFDA by name or specifically referenced the property report requirement or Sanibel's noncompliance with same as a basis for

---

[14]     That price was later renegotiated to $500,000, as reflected in an Addendum to Purchase Agreement executed by Taylor and Martino on September 5, 2006.  (*Id.*)

[15]     In summary judgment filings, Sanibel impugns plaintiffs' motives for rescission, branding plaintiffs not as vulnerable consumers but as opportunistic flippers seeking to extricate themselves from their promises not because they were misled or misinformed, but purely because the condo market in Gulf Shores (and with it plaintiffs' ability to profit on resale of their units in the short term) collapsed prior to the contemplated closing dates.  In support of this proposition, Sanibel cites plaintiffs' depositions where, for example, Pigott testified that she "realized that pricing-wise perhaps they were not a good investment," Hersey testified that "[t]he real estate market in Gulf Shores and Orange Beach had plummeted," and Taylor candidly admitted that he began questioning his desire to purchase a unit at the Project "[w]hen the real estate market went to hell over there."  (Doc. 81-3, at 19-20.)  This Court is not sitting in judgment of the morality of plaintiffs' rescission decisions.  Under the plain terms of the ILSFDA, if the Project is not exempt, then Sanibel's failure to furnish a property report conferred upon plaintiffs an absolute right to back out of the transactions (for good reasons, bad reasons or no reasons) at any time within a two-year period.  *See generally Schatz v. Jockey Club Phase III, Ltd.*, 604 F. Supp. 537, 542 (S.D. Fla. 1985) (opining that ILSFDA plaintiffs are not required to claim actual injury to be entitled to rescind agreement where seller has failed to provide property report, and that absence of harm to plaintiffs arising from nondisclosure makes no difference).  Whether the plaintiffs had a morally defensible reason for rescinding is simply not for this Court to decide.

revocation.[16]

The other plaintiffs' revocation letters focus on Sanibel's alleged failure to abide by ILSFDA disclosure requirements.  On December 22, 2006, Pigott's attorney sent a letter to Sanibel's counsel citing statutory and case authority for the proposition that the Project was subject to the ILSFDA, that the Act obligated Sanibel to furnish Pigott with a property report prior to execution of the Purchase Agreements for Units 204 and 605, that Sanibel had failed to do so, and that Pigott was therefore exercising her option under the ILSFDA to revoke both Purchase Agreements and demand repayment of her earnest money deposits and release of her letters of credit.  (*Id.*)  The Barneses' counsel sent a similar letter to Sanibel's attorney on January 2, 2007.  (*Id.*)  And Taylor and Martino sent a detailed "Notice of Revocation" to Sanibel on March 7, 2007, outlining their position that the ILSFDA covers the Project, that Sanibel had failed to furnish the requisite property report to them, and that those plaintiffs were therefore exercising their statutory right to revoke the Purchase Agreement and seek return and release of their letter of credit.  (*Id.*)

It is undisputed that all of these letters were sent to and received by Sanibel within two years after execution of the respective Purchase Agreements.  It is likewise undisputed that Sanibel declined to honor plaintiffs' requests, refused to rescind the Purchase Agreements, and failed to return or release plaintiffs' cash deposits or letters of credit.  A flurry of federal and state lawsuits followed, all of which have been consolidated in the instant case.

### III.    Summary Judgment Standard.

Summary judgment should be granted only if "there is no genuine issue as to any material fact and ... the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The party seeking summary judgment bears "the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial."  *Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 608 (11th Cir. 1991).  Once the

---

[16]    Sanibel has not argued on summary judgment that the Hersey and Priolet revocation letters were ineffective for failure to mention the property report requirement. Defendant not having challenged the validity of the Hersey/Priolet letters on that basis, the Court will not explore *sua sponte* whether a revocation notice under the ILSFDA must include any particular talismanic words or phrases in order to be effective.

moving party has satisfied its responsibility, the burden shifts to the nonmovant to show the existence of a genuine issue of material fact. *Id.* "If the nonmoving party fails to make 'a sufficient showing on an essential element of her case with respect to which she has the burden of proof,' the moving party is entitled to summary judgment." *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)) (footnote omitted). "In reviewing whether the nonmoving party has met its burden, the court must stop short of weighing the evidence and making credibility determinations of the truth of the matter. Instead, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Tipton v. Bergrohr GMBH-Siegen*, 965 F.2d 994, 999 (11th Cir. 1992) (internal citations and quotations omitted). "Summary judgment is justified only for those cases devoid of any need for factual determinations." *Offshore Aviation v. Transcon Lines, Inc.*, 831 F.2d 1013, 1016 (11th Cir. 1987) (citation omitted).

"The applicable Rule 56 standard is not affected by the filing of cross-motions for summary judgment." *Godard v. Alabama Pilot, Inc.*, 485 F. Supp.2d 1284, 1291 (S.D. Ala. 2007); *see also May v. A Parcel of Land*, 458 F. Supp.2d 1324, 1333 (S.D. Ala. 2006) (same). Indeed, the Eleventh Circuit has explained that "[c]ross-motions for summary judgment will not, in themselves, warrant the court in granting summary judgment unless one of the parties is entitled to judgment as a matter of law on facts that are not genuinely disputed." *United States v. Oakley*, 744 F.2d 1553, 1555 (11th Cir. 1984) (citation omitted); *see also Wermager v. Cormorant Tp. Bd.*, 716 F.2d 1211, 1214 (8th Cir. 1983) ("the filing of cross motions for summary judgment does not necessarily indicate that there is no dispute as to a material fact, or have the effect of submitting the cause to a plenary determination on the merits"). Nonetheless, "cross-motions may be probative of the absence of a factual dispute where they reflect general agreement by the parties as to the dispositive legal theories and material facts." *Godard*, 485 F. Supp.2d at 1291; *see also May*, 458 F. Supp.2d at 1333. That is precisely the case here, at least with respect to the ILSFDA exemption issue, as all parties appear to concur that the exempt or nonexempt status of the Project is a purely legal question for the Court to decide.

## IV.    Analysis of ILSFDA Nondisclosure Claims.

### A.    *Parameters of the Act.*

"The ILSFDA was intended to curb abuses accompanying interstate land sales." *Winter*

*v. Hollingsworth Properties, Inc.*, 777 F.2d 1444, 1448 (11ᵗʰ Cir. 1985).[17]  Indeed, "[t]he underlying purpose of the [ILSFDA] is to insure that a buyer, prior to purchasing certain kinds of real estate, is informed of facts which will enable him to make an informed decision about purchasing the property."  *Law v. Royal Palm Beach Colony, Inc.*, 578 F.2d 98, 99 (5ᵗʰ Cir. 1978); *see also Winter*, 777 F.2d at 1449 (Act's purpose requires that buyer must receive information necessary to make his decision prior to entering into purchase agreement); *United States v. Steed*, 674 F.2d 284, 287 (4ᵗʰ Cir. 1982) (ILSFDA "is a comprehensive statute requiring subdivision developers, unless exempt, to furnish prospective purchasers pertinent information about lots offered for sale").  The Act "should be construed not technically, but flexibly to effectuate its remedial purposes."  *Schatz v. Jockey Club Phase III, Ltd.*, 604 F. Supp. 537, 541 (S.D. Fla. 1985).

One of the ILSFDA's requirements is that a developer selling a nonexempt lot must furnish the purchaser with a so-called "property report" in advance of the execution of a purchase agreement.  *See* 15 U.S.C. § 1703(a)(1)(B) (declaring it unlawful for a developer to use means of communication in interstate commerce "to sell or lease any lot unless a printed property report ... has been furnished to the purchaser or lessee in advance of the signing of any contract or agreement by such purchaser or lessee"); 24 C.F.R. § 1710.3 ("In non-exempt transactions, the developer must give each purchaser a printed Property Report ... in advance of the purchaser's signing of any contract or agreement for sale or lease.").[18]  This property report is

---

[17]    *See also Stein v. Paradigm Mirsol, LLC*, 551 F. Supp.2d 1323, 1327 (M.D. Fla. 2008) ("The ILSFDA is an anti-fraud statute that uses disclosure as its primary tool to protect purchasers from unscrupulous sales of undeveloped home sites."); *Pugliese v. Pukka Development, Inc.*, 524 F. Supp.2d 1370, 1371 (S.D. Fla. 2007) (explaining that the Act was "designed to discourage fraud by keeping buyers informed through rigorous disclosure requirements"); *Aboujaoude v Poinciana Development Co. II*, 509 F. Supp.2d 1266, 1269 (S.D. Fla. 2007) (legislative intent in enacting ILSFDA was to protect purchasers from unscrupulous, out-of-state sales of land purportedly suitable for development but actually underwater or only fit for grazing).

[18]    Although the statutory language is phrased in terms of "lots," it is well-established that the Act's requirements encompass condominium sales such as those herein.  *See Winter*, 777 F.2d at 1449 (holding that the ILSFDA is applicable to the sale of condominiums); *Stein*, 551 F. Supp.2d at 1327 ("Selling a condominium unit falls within the definition of selling

an extensive disclosure that must include such information as, *inter alia*, identification of interested persons; a legal description of the subdivision; a statement of the condition of title to the land; a statement of general terms and conditions (including the range of selling prices); a statement of the present condition of access to the subdivision, existence of unusual conditions relating to noise or safety, availability of sewage disposal and other public utilities, proximity to nearby municipalities, and the nature and completion schedule for proposed improvements; statements relating to any blanket encumbrances; and such other information as the Secretary of HUD might require as reasonably necessary or appropriate for protection of purchasers.  15 U.S.C. §§ 1705, 1707; *see also Law*, 578 F.2d at 99 n.2 ("The property report is required to reflect information about the subdivision contained in a statement of record on file with the Secretary of [HUD] and other information deemed by the Secretary to be necessary or appropriate in the public interest or for the protection of consumers.").  The fundamental purpose of the property report requirement is to provide "information designed to assist potential buyers in making a fully-informed decision whether to purchase."  *Harvey v. Lake Buena Vista Resort, LLC*, --- F. Supp.2d ----, 2008 WL 1843909, *2 (M.D. Fla. Apr. 22, 2008).

It is undisputed that Sanibel provided none of the eight plaintiffs in this case with a printed property report prior to their signing of the respective Purchase Agreements.  As such, if the Project is not exempt from the ILSFDA's disclosure requirements, then Sanibel is in violation of that statute.  Ultimately, then, plaintiffs' disclosure-related claims hinge on whether or not the Project is exempt.  In general, the ILSFDA excludes from the registration and disclosure requirements (including the property report) "the sale or lease of lots in a subdivision containing fewer than one hundred lots which are not exempt" under any of eight recognized statutory exemptions. 15 U.S.C. § 1702(b)(1); *see generally Trotta v. Lighthouse Point Land Co., LLC*, 551 F. Supp.2d 1359, 1362 (S.D. Fla. 2008) (recognizing that § 1702(b) exempts developments with fewer than 100 units from the Act's property report requirement).  Sanibel maintains that the 108-unit Project consists of fewer than 100 lots which are not exempt from the ILSFDA, because at least 9 units are exempt for purposes of § 1702(b)(1).

---

a lot within the meaning of the ILSFDA."); *Schatz*, 604 F. Supp. at 541 ("this Court holds that condominiums, or unit properties, are within the application of the federal statute").

Given the statute's remedial objective, "when faced with an ambiguity regarding the scope of an exemption [in the ILSFDA], the court must interpret the exemption narrowly, in order to further the statute's purpose of consumer protection." *Taylor v. Holiday Isle, LLC*, 561 F. Supp.2d 1269, 1271 n.5 (S.D. Ala. 2008) (citing *Meridian Ventures, LLC v. One North Ocean, LLC*, 538 F. Supp.2d 1359 (S.D. Fla. 2007)); *see also Markowitz v. Northeast Land Co.*, 906 F.2d 100, 105 (3rd Cir. 1990) ("exemptions from remedial statutes such as the Act are to be narrowly construed"); *Harvey*, 2008 WL 1843909, at *6 ("Under federal law, exemptions under the ILSFDA must be narrowly and strictly construed."). The obvious corollary to this principle is that the terms of the ILSFDA must "be applied liberally in favor of broad coverage." *N & C Properties v. Windham*, 582 So.2d 1044, 1048 (Ala. 1991); *see also Olsen v. Lake Country, Inc.*, 955 F.2d 203, 205 (4th Cir. 1991) ("The language of the Act is meant to be read broadly to effectuate" purposes of prohibiting fraud and protecting purchasers of land).

## B.    Plaintiffs' Right of Rescission.

The question of whether Sanibel was or was not obligated to furnish plaintiffs with an ILSFDA property report is of much more than merely casual interest. If a property report is not furnished to purchasers in advance of the signing of a purchase agreement for a lot covered by the ILSFDA, "[t]he plain language of the statute gives them the right to rescind that agreement." *Law*, 578 F.2d at 101. Indeed, the Act provides that, as to any purchase agreement for a lot "for which a property report is required by this chapter and [for which] the property report has not been given to the purchaser or lessee in advance of his or her signing such contract or agreement, such contract or agreement may be revoked at the option of the purchaser or lessee within two years from the date of such signing." 15 U.S.C. § 1703(c).[19] Where a purchaser properly

_____

[19]    Sanibel repeatedly insists that any right of revocation plaintiffs might have does not arise under § 1703(c), but must instead rest exclusively on § 1703(b). (Doc. 92, at 3-4 & n.1.) This contention is opaque. Section 1703(b) provides that purchase agreements for nonexempt lots "may be revoked at the option of the purchaser or lessee until midnight of the seventh day following the signing of such contract or agreement or until such later time as may be required pursuant to applicable State laws." 15 U.S.C. § 1703(b). Meanwhile, § 1703(c) is targeted specifically at purchasers' two-year revocation rights where the required property report is not supplied. It is quite clear from the pleadings and plaintiffs' summary judgment filings that the ILSFDA revocation remedy they seek arises from Sanibel's failure to provide a property report. They are not invoking the seven-day automatic right of rescission and did not seek to

-12-

exercises his or her ILSFDA revocation rights under § 1703(c), "such purchaser or lessee shall be entitled to all money paid by him or her under such contract or agreement." 15 U.S.C. § 1703(e); *see also Taylor*, 561 F. Supp.2d at 1271 (recognizing that § 1703(c) authorizes a purchaser to revoke a purchase agreement within two years if a property report is required and was not furnished to the purchaser in advance of agreement's execution); *Stein v. Paradigm Mirsol, LLC*, 551 F. Supp.2d 1323, 1332 (M.D. Fla. 2008) (where developer did not provide property report, and sales agreement was not exempt from ILSFDA reporting requirements, plaintiffs were entitled to terminate agreement and to return of all monies they paid under that agreement).

It is undisputed in this case that all eight plaintiffs exercised their putative revocation rights within two years after signing their respective Purchase Agreements. If the Project is not exempt from the ILSFDA, then those revocation notices are valid and effective, in which case plaintiffs are entitled to terminate those agreements, recover their earnest money deposits, and walk away. If, however, the Project is exempt, then plaintiffs' revocation letters lack legal force because plaintiffs possessed no statutory right to rescind their transactions with Sanibel for want of a property report.

## C.    *Which Exemptions Are in Play?*

Given the centrality of the exemption issue to the claims joined in this action, one would expect the parties' summary judgment submissions to be narrowly focused on the particular exemptions that are in dispute. Unfortunately, the identity of the exemptions claimed by Sanibel has proven to be a moving target that has shifted repeatedly during this litigation, including during the discovery and summary judgment briefing processes. As a result of defendant's indecisiveness and/or plaintiffs' misunderstanding of defendant's position, significant portions of the Rule 56 submissions unhelpfully address exemptions that Sanibel now disclaims any intent to pursue. It therefore becomes incumbent on the Court to sift through the masses of legal

---

rescind within seven days. As such, the Court rejects Sanibel's invitation to analyze plaintiffs' ILSFD rescission claims through the lens of § 1703(b), when they are obviously proceeding under § 1703(c).

arguments to discern which exemptions are actually being claimed by Sanibel at this time.[20]  To alleviate any confusion on this point, the Court will explain (1) why it is not considering certain exemptions mentioned in the parties' briefs and (2) which exemptions remain.

Several ILSFDA exemptions referenced in the Rule 56 briefing are no longer in play. For example, both sides devoted briefing space to the exemption for "sale or lease of land under a contract obligating the seller or lessor to erect such a building thereon within a period of two years." 15 U.S.C. § 1702(a)(2).  Nine of the 108 units were subject to preconstruction contracts that unconditionally obligated Sanibel to construct the units within two years of the contract date, while the remaining contracts included a so-called "need not be built" contingency.  The Act is clear that this "two-year contract" exemption does not apply if "the method of disposition is adopted for the purpose of evasion of" the ILSFDA.  15 U.S.C. § 1702(a).  The record confirms, and Sanibel concedes, that the two-year provision was written into those nine contracts for the sole purpose of circumventing the ILSFDA; therefore, as Sanibel prudently acknowledges, the "two-year contract" exemption codified at § 1702(a)(2) does not apply here. (Doc. 81-3, at 12; doc. 92, at 4 & n.2.)[21]

Another defense referenced in the summary judgment briefs is the exemption for "sale or lease of lots to any person who acquires such lots for the purpose of engaging in the business of constructing residential, commercial, or industrial buildings or for the purpose of resale or lease of such lots to persons engaged in such business." 15 U.S.C. § 1702(a)(7).  In its response to plaintiffs' Rule 56 Motion, Sanibel states that it has abandoned the § 1702(a)(7) defense, as well.

---

[20]     An unanswered question in the summary judgment briefs is why the parties did not effectively utilize the discovery process to winnow down exactly which exemptions were or were not under consideration, and why Sanibel waited until the midst of Rule 56 briefing before jettisoning certain exemptions, leaving a path of false trails, wasted arguments, and lack of clarity for the Court in picking through the parties' respective legal arguments.  The summary judgment exercise would have been greatly simplified for all concerned had the parties streamlined this matter by isolating the particular exemptions in dispute before Rule 56 briefing commenced, rather than doing so on the fly in the midst of such briefing.

[21]     Indeed, Sanibel states in its principal Rule 56 brief that "[u]nder the above facts the statute precludes any argument that the two years to build exemption is available to the defendant in this case."  (Doc. 81-3, at 12.)  This Court concurs.

(Doc. 92, at 5, 6 & n.3.)[22]  That exemption will not be considered.

Having abandoned two of its claimed exemptions, Sanibel now rests its defense to the ILSFDA nondisclosure claim on two other defenses.  First, Sanibel asserts that 13 units of the Project are exempt under 24 C.F.R. § 1710.14(b)(3) (which defendant refers to as the "lots sold to developers" exemption, but which is perhaps more accurately labeled the "bona fide land sales business" exemption).  Second, defendant contends that 14 units of the Project are exempt because they were "not sold under a common promotional plan."  (Doc. 81-3, at 13.)  Under either theory, the total number of nonexempt units would be less than 100, rendering the Project exempt from statutory disclosure requirements pursuant to § 1702(b)(1).  Accordingly, plaintiffs' ILSFDA claims relating to Sanibel's failure to provide them with a property report stand or fall on the availability of the "bona fide land sales" and "common promotional plan" defenses.[23]

### D.     The "Bona Fide Land Sales Business" Exemption.

Regulations promulgated by the Secretary of HUD identify certain "regulatory exemptions" from the Act's registration requirement.  One such regulatory exemption excludes "[t]he sale of lots to a person who is engaged in a bona fide land sales business" from the registration requirements of the ILSFDA.  24 C.F.R. § 1710.14(a)(3).[24]  The term "bona fide land

---

[22]     In that regard, defendant, while admitting it had previously interposed the § 1702(a)(7) exemption in this action, indicated in its response brief that "[b]y its terms this exemption is obviously inapplicable to a contract for the sale of a condominium which is contemplated to be completed prior to closing."  (Doc. 92, at 5 n.3.)  Defendant further succinctly stated that "we have abandoned the 1702(a)(7) defense."  (*Id.* at 6.)

[23]     With respect to each such exemption, the Court is cognizant that "a developer is not required to file notice with or obtain the approval of the Secretary in order to take advantage of an exemption.  If a developer elects to take advantage of an exemption, the developer is responsible for maintaining records to demonstrate that the requirements of the exemption have been met."  24 C.F.R. § 1710.4(d).

[24]     This regulation is phrased solely in terms of exemption "from the registration requirements of the Act."  24 C.F.R. § 1710.14(a).  The ILSFDA's requirement that developers register certain lots with HUD pursuant to 15 U.S.C. § 1704 appears distinct from the statutory requirement that a property report be furnished to purchasers pursuant to 15 U.S.C. §§ 1703(a)(1)(B) and 1707.  *See* 15 U.S.C. § 1702(b) (discussing statutory exemptions from "the provisions requiring registration and disclosure," implying that registration and disclosure are separate obligations under the ILSFDA).  That said, the Secretary of HUD has explained in

sales business" is defined neither in the ILSFDA nor (contrary to Sanibel's suggestion) in the text of the regulations themselves. However, the Secretary of HUD has published a document entitled "Supplemental Information to Part 1710: Guidelines for Exemptions Available Under the Interstate Land Sales Full Disclosure Act," and found at 61 Fed. Reg. 13596-01 (1996), beginning at 13601 (the "Guidelines"). Those Guidelines elaborate on the "bona fide land sales business" exemption as follows: "For a transaction to qualify for this exemption, the purchaser must be a person who plans to subsequently sell or lease the lot(s) in the normal course of business. The term business refers to an activity of some continuity, regularity and permanency, or means of livelihood." 61 Fed. Reg. at 13609.

In support of the § 1710.14(a)(3) exemption, Sanibel contends that four investors (Paul L. Nabors, Keith Morris, H. Wayne Burnett, and William I. Parks) each agreed to buy unit(s) of the Project "[i]n furtherance of their separate condominium speculation businesses" through which they "supplement[] their incomes." (Doc. 81-3, at 4.) All told, these four investors contracted with Sanibel to purchase 13 units (specifically, Units 404, 601, 703, 801, 805, 806, 1104, 1203, 1204, 1205, 1705, 1801, and 1805). (*Id.*) Sanibel's Rule 56 submission includes affidavits from Nabors, Morris, Burnett and Parks in support of these allegations.

The Court does not reach the merits of this "bona fide land sales business" exemption. Sanibel never told plaintiffs during the designated discovery period of this action that it intended to rely on the "bona fide land sales business" exemption using those particular 13 units and those particular 4 investors. Indeed, in response to an interrogatory from the Priolet/Hersey plaintiffs in August 2007 asking it to identify every reason why it was claiming exemption from the ILSFDA, Sanibel said nothing about Units 404, 601, 703, 801, 805, 806, 1104, 1203 or 1801 in connection with that exemption, but instead identified eight different units (Units 305, 701, 901, 1003, 1005, 1503, 1605 and 1707) not referenced on summary judgment. (Doc. 79, Exh. G, at

---

Guidelines accompanying the Act's regulations that these regulatory exemptions are intended to apply to both "the registration and full disclosure requirements of the Act (*i.e.*, filing a Statement of Record and furnishing a Property Report)." 61 Fed. Reg. at 13608. Absent any objection by plaintiffs, the Court adopts the Guidelines approach of applying the § 1710.14(a)(3) exemption to the Act's disclosure requirements.

#13(F).)[25]  Similarly, in response to an interrogatory requesting that it identify each purchaser of a Project unit that is in the "bona fide land sales business," Sanibel omitted mention of Nabors, Burnett or Parks (who together account for seven of the subject units).  (*Id.* at #14.)  During Sanibel's Rule 30(b)(6) deposition in October 2007, plaintiff's counsel inquired as to whether defendant's response to Interrogatory #13 was complete and whether Sanibel contended that any other units were exempt.  In response, Sanibel's counsel assured plaintiffs' counsel that no other units were being claimed as exempt.[26]  Thus, the first time plaintiffs <u>ever</u> heard that Sanibel was claiming the "bona fide land sales business" exemption with respect to Units 404, 601, 703, 801, 805, 806, 1104, 1203 or 1801, or with respect to purchasers Nabors, Burnett or Parks, was upon receipt of Sanibel's Motion for Summary Judgment on June 1, 2008, more than two months after

---

[25]     Sanibel's interrogatory response did mention Units 1204, 1205, 1705 and 1805 in connection with the bona fide land sales business exemption, but did not identify the other nine units that it now claims in support of same.  (Doc. 79, Exh. G, at #13(F).)

[26]     The following exchange from that deposition is pertinent:

| "MR. McKERALL: | Andrew, let me say, as the lawyer [for Sanibel], I'm not aware that we're claiming any other units than those.  Those are all the ones that we claimed might be exempt for one reason or another. |
| "MR. HARRELL: | Yeah.  Well, you can understand why I'm asking that question.  I just don't want it to come up later that, oh, yeah, we've got these other units that we're claiming as exempt. |
| "MR. McKERALL: | As far as I know, that's all there are. |
| "MR. HARRELL: | Okay. |
| "MR. McKERALL: | You know, and we went over it pretty thoroughly, and I can't think of any that we didn't consider one way or another is it or isn't it.  I think that's all.  Pretty sure that's all." |

(Hirras Dep., at 194-95.)  Particularly given defendant's failure to supplement its discovery responses prior to the court-imposed deadline (which occurred more than five months after above-quoted exchange), plaintiffs' counsel were entitled to rely on these representations in preparing their Rule 56 filings and otherwise positioning this case for trial.  Based on this history and all surrounding circumstances, allowing Sanibel to revamp its exemption claims at this late date would unquestionably work substantial unfair prejudice on plaintiffs and would thwart the entire purpose of the discovery process and the scheduling orders.

the March 31, 2008 discovery cutoff and three days after plaintiffs had submitted their own motion for summary judgment on the ILSFDA disclosure issues.[27]

Plaintiffs have filed a Motion to Strike (doc. 93) this newly-raised evidence as untimely and prejudicial.  Defendant elected not to respond.  Under the circumstances, the Court concludes that Sanibel is barred from using the offending information by the Federal Rules of Civil Procedure, which provide in relevant part as follows: "If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at trial, unless the failure was substantially justified or is harmless."  Rule 37(c)(1), Fed.R.Civ.P.  The Court having found that Sanibel failed to provide timely supplementation of its responses to Interrogatories 13 and 14, that Sanibel has failed to show that such failure was substantially justified, and that plaintiffs have made a substantial showing of unfair prejudice occasioned by such failure, the Motion to Strike is **granted**.  All references to Units 404, 601, 703, 801, 805, 806, 1104, 1203 and 1801, as well as to Nabors, Burnett and Parks, are hereby **stricken** from the summary judgment record.

From the remaining evidence of record, the only units that Sanibel has identified as being subject to the bona fide land sales business exemption are Units 1204, 1205, 1705 and 1805. Even if the Court were to find that those four units did fall within the ambit of the regulatory

_____

[27]     On June 13, 2008, nearly two weeks after filing its Motion for Summary Judgment and dropping the bombshell of newly identified units and purchasers supporting the "bona fide land sales business" exemption, Sanibel filed a Motion for Leave to Supplement Its Responses to Discovery (doc. 85) to incorporate this new information into its prior discovery responses.  Magistrate Judge Cassady denied that Motion as untimely and lacking a showing of diligence or exceptional circumstances that might warrant modification of long-expired Scheduling Order deadlines.  (*See* doc. 88.)  Magistrate Judge Cassady likewise denied Sanibel's ensuing Motion to Reconsider (doc. 89), and this Court entered an Order (doc. 100) on July 23, 2008 rejecting Sanibel's appeal of the Magistrate Judge's rulings.  *See Pigott v. Sanibel Development, LLC*, 2008 WL 2937804 (S.D. Ala. July 23, 2008).  Thus, the issue of whether Sanibel could supplement its discovery responses out of time to include these newly-raised facts relating to its § 1710.14(a)(3) defense has been comprehensively litigated, with both Magistrate Judge Cassady and the undersigned concluding upon independent review that Sanibel failed to make any substantial showing why it could not have supplemented its discovery responses with the information in question prior to the unambiguous April 30, 2008 supplementation deadline established in the applicable Rule 16(b) Scheduling Order.

exemption found at § 1710.14(a)(3), such that they did not count for ILSFDA purposes, the 108-unit Project would remain above the § 1702(b)(1) threshold of 100 units and would therefore not be exempt from the registration and disclosure requirements of the Act.  That conclusion obviates the need for discussion or analysis of the § 1710.14(a)(3) defense on the merits, because even if the subject units were covered by that exemption, the remaining nonexempt units would exceed 100, such that Sanibel would remain bound by the ILSFDA's disclosure requirements.[28]

> **E.      The "Not Part of a Common Promotional Plan" Exemption.**

Sanibel also asserts that the Project is exempt from the property report requirement

---

[28]      Although unnecessary to the Court's ruling, in light of the granting of plaintiffs' Motion to Strike, the undersigned notes that even if the excluded evidence were considered, the "bona fide land sales business" exemption would remain inapplicable here.  In particular, this Court is of the opinion that the activities of Nabors, Morris, Burnett and Parks do not qualify for that exemption, as a matter of law.  By its express terms, that exemption applies to "[t]he sale of lots to a person who is engaged in a bona fide land sales business."  24 C.F.R. § 1710.14(a)(3). HUD Guidelines explain that this exemption applies only where "the purchaser ... plans to subsequently sell or lease the lot(s) in the normal course of business."  Guidelines, 61 Fed. Reg., at 13609.  But the affidavit statements of Nabors, Morris, Burnett and Parks intimate that they never intended to buy their units in the first place; rather, all of them unequivocally averred that their intent upon entering purchase agreements with Sanibel was immediately to transfer their contractual interest in those units to third parties at a profit, without ever closing on the purchase. For example, Nabors states, "At the time I contracted to purchase each such unit of Sanibel, a Condominium, my sole intent was to immediately sell my position in the unit to another buyer at a profit, prior to having to close on the unit."  (Nabors Aff., at 1.)  The affidavits of Morris, Burnett and Parks are comparable in this respect.  Morris even admits that his business is "speculating in pre-construction condominium contracts."  (Morris Aff., at 1.)  Thus, these investors never intended to buy the units and resell them, but instead intended to acquire a purely contractual interest in the units, then "flip" that contractual interest to third parties for a profit. That is in fact what occurred with respect to a number of the units, such that Nabors, Morris, Burnett and Parks did not resell those units in the normal course of business, but instead resold their contractual right to purchase those units in the normal course of business.  Plaintiffs persuasively assert that if the term "bona fide land sales business" is construed narrowly, as it must be, then these investors' planned activities of condominium contract speculation simply do not fall within its parameters.  Defendant has proffered no rebuttal to plaintiffs' contention, and the Court will not formulate Sanibel's legal arguments for it.  Accordingly, in light of the narrow construction that ILSDFA exemptions are to be given in light of the Act's remedial purpose, the "bona fide land sales business" exemption cannot be enlarged to cover these investors' activities as to the Project.  For that reason, the § 1710.14(a)(3) exemption would be unavailing to Sanibel even if the Motion to Strike were denied and defendant's evidence relating to same were accepted and considered.

because fewer than 100 units of the Project were subject to a "common promotional plan." Although plaintiffs question its very existence,[29] this principle is firmly rooted in the statutory language. As discussed, the 100-lot exemption applies to "the sale or lease of lots in a subdivision containing fewer than one hundred lots which are not exempt." 15 U.S.C. § 1702(b)(1). The term "subdivision" is defined by Congress as land which "is divided or is proposed to be divided into lots, whether contiguous or not, for the purpose of sale or lease as part of a common promotional plan." 15 U.S.C. § 1701(3). Thus, for purposes of applying the 100-lot exemption, the "subdivision" in which the number of units is counted consists only of those units that are subject to a common promotional plan. Stated differently, if fewer than 100 units of the Project are part of a "common promotional plan," then the Project is necessarily "a subdivision containing fewer than one hundred lots," such that Sanibel would be excused from compliance with the registration and property report requirements of the ILSFDA before entering into Purchase Agreements with plaintiffs.[30] The critical question, then, is whether at least 100 units within the Project were intended to be sold "as part of a common promotional plan."[31]

Sanibel asserts that 14 units of the Project were sold to principals or investors of Sanibel itself, and were never offered to the public, such that those units were not subject to a "common

---

[29]    Indeed, plaintiffs accuse defendant of "attempt[ing] to read the exemption into the Act." (Doc. 94, at 14.) This contention is misguided, inasmuch as the "common promotional plan" is a conceptual cornerstone to the definition of "subdivision" on which the 100-unit exemption is predicated.

[30]    As one district court correctly summarized, "[t]he relevance of lots sold as part of a common promotional plan is that such lots are considered a subdivision under ILSFDA. ... The meaning of subdivision is important because various exemptions to ILSFDA exist for the sale or lease of lots in subdivisions of various sizes." *Tomlinson v. Village Oaks Development Co.*, 2003 WL 21180644, *3 (S.D. Ind. Apr. 17, 2003); *see also Eaton v. Dorchester Development, Inc.*, 692 F.2d 727, 728-29 (11th Cir. 1982) (examining common promotional plan issue where plaintiffs contended that development was not exempt from ILSFDA because it was part of a larger "subdivision" containing more than 100 units).

[31]    For purposes of this analysis, the Court bears in mind that "the 100 lot exemption applies to the number of lots as opposed to the number of sales." 61 Fed. Reg. at 13604. Sanibel opposes this notion, but offers no principled basis for rejecting the HUD Guidelines on this point.

promotional plan" with the remaining units of the Project.  If those 14 units are excluded, then no more than 94 units of the Project were subject to a common promotional plan, such that the development could not constitute a subdivision containing 100 or more units because only those units linked by such a common promotional plan qualify as a subdivision for ILSFDA purposes.[32]

The 14 units in question have been identified as Units 601, 801, 1201, 1401, 1404, 1501, 1502, 1504, 1507, 1701, 1706, 1707, 1801 and 1802 (collectively, the "Principal/Investor Units").  Certain individuals within Sanibel's ownership group were afforded "first dibs" to purchase units of the Project at a discounted price without having to pay any real estate commission.  (Hirras Dep., at 31.)  These persons were either members of Sanibel, or members of a separate company called Sanibel Partners, LLC (which was itself a principal in Sanibel), or members of corporate/legal entities that were members of Sanibel Partners.  (*Id.* at 35-37.)  These owners/principals were offered an opportunity to purchase discounted units in the Project (evidently, as many as they wanted) before any such units were offered for sale to the general public.  (*Id.* at 79-80.)[33]  Remaining unsold units after these owner/principal sales were allocated

---

[32]      In addition to the 14 investor units, Sanibel identifies two other units that it contends are not within the borders of a common promotional plan.  In particular, Sanibel presents evidence and argument that Units 1001 and 1101 were never promoted at all, but were instead conveyed to two individuals (Larrimore and Rouse) who had sold to Sanibel parcels of land upon which the Project was built.  As part of the consideration for acquiring those parcels of land, Sanibel agreed to sell Unit 1001 to Larrimore and Unit 1101 to Rouse at a discount.  (Doc. 81, at Exh. E & F.)  The Court need not examine the status of these two units specifically, however, because they do not matter for ILSFDA coverage purposes.  If the 14 investor units are part of a common promotional plan with the other Project units, then there are more than 100 units linked by a common promotional plan and the Act's disclosure requirements apply, regardless of whether Units 1001 and 1101 were or were not part of that common promotional plan.  Likewise, if the 14 investor units are not part of a common promotional plan with the other Project units, then the 100-unit threshold cannot be satisfied and the property report requirement cannot apply to Sanibel, irrespective of the status of Units 1001 and 1101.  Simply stated, these two units need not be examined separately because they cannot sway the outcome of the exemption analysis either way.

[33]      Sanibel's attorney characterized the offers made by the company to its owners/principals to purchase units at the Project in the following terms: "It's all informal.  Call on the phone.  Do you want any?  How many do you want?"  (Hirras Dep., at 81.)

to the listing agent, Visions Real Estate, to be marketed to the public.  (*Id.* at 80.)  The 14 Principal/Investor Units were the ones sold to Sanibel owners/investors via the first step of this process.[34]  Defendant contends that these 14 units cannot reasonably be deemed to be part of a common promotional plan with the other 94 units because they were diverted for sale to Sanibel investors before any units were referred to the Project's listing agent for sale to the public.

Plaintiffs offer no quarrel with these facts, but they do disagree with Sanibel's application of the "common promotional plan" principle to the 14 Principal/Investor Units.[35]  Plaintiffs' argument centers on the statutory definition of "common promotional plan" as a "plan, undertaken by a single developer or group of developers acting in concert, to offer lots for sale or lease."  15 U.S.C. § 1701(4).  Plaintiffs also rely on Congress's creation of a presumption of a

---

[34]     Some of these units are still owned by these Sanibel owners/investors, while others have since been resold to third parties by various agents.  (Hirras Dep., at 231-32.)

[35]     As an initial response, plaintiffs urge the Court to strike the "common promotional plan" argument because Sanibel did not plead it as an affirmative defense.  (Doc. 94, at 13 n.10.)  This contention fails for three reasons.  First, plaintiffs misapprehend the nature of the "common promotional plan" issue.  It is not a separate statutory or regulatory exemption, but is instead a definitional linchpin of the 100-unit exemption, which Sanibel did plead as an affirmative defense.  (*See* doc. 24, at 4; doc. 25, at 6.)  Second, even if it were an affirmative defense, Sanibel's omission of it in its pleadings does not conclude the inquiry.  Under Eleventh Circuit law, "omission of an affirmative defense is not fatal as long as it is included in the pretrial order."  *Pulliam v. Tallapoosa County Jail*, 185 F.3d 1182, 1185 (11th Cir. 1999); *see also Hargett v. Valley Federal Sav. Bank*, 60 F.3d 754, 763 (11th Cir. 1995) ("if a party omits the defense of statute of limitations in the answer, the defense is not waived if the litigant includes it in the pretrial order").  Plaintiffs offer no argument why Sanibel has not adequately cured its failure to present the affirmative defense in its answer by raising it in its principal brief on summary judgment, well in advance of the pretrial order.  Third, the touchstone of the Rule 8(c) pleading requirement for affirmative defenses is the prevention of unfair prejudice or surprise to the plaintiff.  "When there is no prejudice, the trial court does not err by hearing evidence on the issue."  *Grant v. Preferred Research, Inc.*, 885 F.2d 795, 797-98 (11th Cir. 1989) (affirmative defense was properly raised in summary judgment motion, even though not pleaded previously, where plaintiff failed to show any prejudice from lateness of pleading); *see also Mitchell v. Jefferson County Bd. of Educ.*, 936 F.2d 539, 544 (11th Cir. 1991) (finding no abuse of discretion for district court to consider affirmative defense that defendant had failed to plead, where plaintiff could not legitimately claim surprise and prejudice from failure to plead defense affirmatively).  Plaintiffs have not shown, or even suggested, that they were prejudiced by defendant's omission of the "common promotional plan" angle to its invocation of the 100-unit exemption in the answer.

common promotional plan under certain circumstances, to-wit: "where such land is offered for sale by such a developer or group of developers acting in concert, and such land is contiguous or is known, designated, or advertised as a common unit or by a common name, ***such land shall be presumed, without regard to the number of lots covered by each individual offering, as being offered for sale or lease as part of a common promotional plan***." *Id.* (emphasis added); *see Paniaguas v. Aldon Companies, Inc.*, 2006 WL 2568210, *11 (N.D. Ind. Sept. 5, 2006) (applying presumption where development constituted land offered for sale by a developer, where such land was known by the common names of Fieldstone Crossing and Fieldstone Crossing Townhomes).

It cannot reasonably be disputed, and defendant does not dispute, that the Project consisted of contiguous land (*i.e.*, 108 condominium units, all located within a single high-rise tower) offered for sale by a single developer (*i.e.*, Sanibel) and known, designated or advertised by a common name (*i.e.*, "Sanibel, a Condominium"). As such, the statutory presumption is triggered, and it is presumed that all 108 units of the Project were offered for sale as part of a common promotional plan. It therefore falls upon Sanibel to rebut that presumption.[36]

After careful consideration of the summary judgment record and the parties' arguments, the Court determines that defendant has failed to overcome this statutory presumption. Defendant would divide the Project's 108 units into two categories, namely: (1) the 14 Principal/Investor Units, which were never marketed to the public or placed with the listing agent; and (2) the remaining units which were in fact marketed to the public and placed with the listing agent. But this is a false distinction. Far from there being two distinct sets of units with two distinct promotional plans, Sanibel treated all unsold units the same at every point in time. Specifically, the record reveals a single, two-stage common promotional plan, functioning as follows: There were 108 units in the same tower, owned by the same developer, and bearing the same name. Before selling units to anyone else, Sanibel contacted certain company insiders and invited them to buy units of the Project at a discount. By all appearances, these insiders could choose from the entire 108-unit inventory and could select as many units from that inventory as

---

[36]     Sanibel correctly asserts that the presumption created by § 1701(4) is not conclusive or irrebuttable.

they wanted to purchase.[37]  Then, whatever units were remaining in inventory following the insider offering were offered to the public.  Seen in this light, all unsold units were treated the same for promotional purposes at all times.  There were not two differentiated pools of inventory.  That the 14 Principal/Investor Units were removed from inventory by virtue of being sold during Sanibel's internal sales efforts for the development does not mean that they were part of a different promotional plan than the units later marketed to the public.  In arguing otherwise, defendant overlooks HUD's admonition that "[t]he phrase common promotional plan is most often misunderstood by those who believe that promotion implies an enthusiastic sales campaign."  Guidelines, 61 Fed. Reg., at 13602.  That the Principal/Investor Units were not subject to an "enthusiastic sales campaign" while the other units were does not imply that they were not subject to a common promotional plan, where all unsold units were in the same inventory pool at all times.

This conclusion is bolstered by other provisions of the HUD Guidelines.  In particular, the Guidelines provide that "essential elements of a common promotional plan are a thread of common ownership or developers acting in concert."  61 Fed. Reg. at 13602.  The "common ownership" element is unquestionably present here.  Furthermore, the Guidelines point to the following additional factors to be used in assessing the presence of a common promotional plan: (a) same or similar name or identity; (b) common sales agents; (c) common sales facilities; (d) common advertising; and (e) common inventory.  *Id.*; *see Eaton v. Dorchester Development, Inc.*, 692 F.2d 727, 731 (11th Cir. 1982) (identifying relevant factors for purposes of determining whether common promotional plan exists as including "a thread of common ownership; common sales agents; common sales facilities; common advertising; common inventory").  All 108 units of the development were subject to common ownership, a common name, and common

---

[37]    The record is devoid of any suggestion that only certain pre-marked, pre-designated units were made available for Sanibel principals and investors.  Rather, as Sanibel concedes, the process was an informal one in which Sanibel called these insiders and asked them whether they wanted to buy any units and, if so, how many.  There is no indication that these principals/investors could only choose from some discrete subset of units of the Project.  Whatever units the principals/investors bought would not be marketed to the public, and whatever units the principals/investors did not buy would be marketed to the public.  This arrangement is patently a common promotional scheme for all units.

inventory.  At any given moment, all unsold units in inventory were treated the same way by Sanibel and/or its listing agent for purposes of marketing and promotion.  That those marketing tactics shifted over time (beginning with internal marketing to certain favored company principals or investors, before switching to external marketing to the public of all unsold inventory) in no way bespeaks the absence of a common promotional plan.[38]

　　　　For these reasons, the Court finds that defendant has failed to overcome the statutory presumption that a common promotional plan existed.  The few authorities the Court has located on this point adopt similar reasoning.  *See generally Hammar v. Cost Control Marketing and Sales Management of Virginia, Inc.*, 757 F. Supp. 698, 700 (W.D. Va. 1990) (where lots of Lake Monticello development were extensively advertised as a common unit by a common name, that development "clearly meets the Act's definition of a subdivision as lots offered for sale as part of a common promotional plan");  *Windham*, 582 So.2d at 1047-48 (combining phase I and phase II of twin condominium tower project for ILSFDA exemption purposes where developer had retained option to build second phase, had reserved the land, and had issued promotional material depicting both towers, such that phase I and II were part of common promotional plan);  *N & C Properties v. Pritchard*, 525 So.2d 1346, 1349 (Ala. 1988) (Phase I and Phase II of a single development constitute common promotional plan, even though construction on Phase II had not yet begun and it had not been formally offered for sale, because "developers cannot

---

[38]　　　　Were the law otherwise, the ILSFDA would become a toothless remedial statute, indeed.  It is difficult to discern any reasonably limiting principle to the interpretation advocated by Sanibel.  If that approach were valid, a countless variety of arbitrary devices that disaggregate unitary developments of 100-plus units into smaller pieces for promotional purposes would liberate developers from the Act's notice and disclosure requirements.  Under Sanibel's logic, dividing a development in half and marketing half in one month and half in another month would suffice to render the entire development eligible for the § 1702(b)(1) exemption because each month's offering would be a different promotional plan.   Promoting one half of the units by mailings and the other half by telephone solicitations would achieve the same result.  Or listing one half of the units with one sales agent and one half with another sales agent.  Or calling units facing the Gulf of Mexico "Sanibel Gulf" and units facing Little Lagoon  "Sanibel Lagoon."  Or marketing one half of the units exclusively to Alabama residents and the other half exclusively to Mississippi residents.  Given the remedial purposes of the ILSFDA and the oft-repeated admonition that its exemptions are to be construed narrowly, such arbitrary line-drawing cannot suffice to enable a developer to sidestep the statute's disclosure requirements.

avoid application of the act simply by breaking the development into two smaller segments").

The Court having found as a matter of law that the 14 Principal/Investor Units were subject to a common promotional plan with the other 94 units, the Project clearly constitutes a single subdivision exceeding 100 units that are not exempt from the Act. Therefore, the § 1702(b)(1) exemption for the sale of lots in a subdivision containing fewer than 100 nonexempt lots is not available. Sanibel having claimed no other exemptions, the necessary implication of this determination is that Sanibel was in violation of the ILSFDA by failing to furnish plaintiffs with a property report prior to their execution of the Purchase Agreements. *See* 15 U.S.C. § 1703(a)(1)(B) (declaring it unlawful for developer to sell any nonexempt lot without providing a printed property report to the purchaser in advance of the signing of the purchase agreement). Because of Sanibel's noncompliance with this disclosure requirement, all eight plaintiffs were entitled under the ILSFDA to revoke their Purchase Agreements within two years after execution of same. *See* 15 U.S.C. § 1703(c) (creating right to revocation). It is undisputed that all plaintiffs timely availed themselves of this right; therefore, the Court finds as a matter of law that those revocations were effective. Sanibel is obligated under 15 U.S.C. § 1703(e) to return to plaintiffs all moneys paid by them and to release all letters of credit posted by them in connection with those now-revoked Purchase Agreements.

## V.   Analysis of ILSFDA Fraud Claims.

The Court having resolved all plaintiffs' ILSFDA causes of action relating to Sanibel's failure to furnish them with a printed property report, as well as Sanibel's implicit counterclaims for declaratory judgment in these consolidated actions, one other category of claims remains. In particular, plaintiffs Susan Hersey and Cynthia and Phillippe Priolet have advanced ILSFDA fraud claims in Counts Two and Three of their Amended Complaint (doc. 54).[39] To be clear, and contrary to Sanibel's summary judgment arguments, Hersey and the Priolets are not interposing Alabama fraud theories, but are instead traveling under 15 U.S.C. § 1703(a)(2), which prohibits

---

[39]   Plaintiffs Richard Taylor and Steve Martino did not advance any fraud claims, and plaintiffs Janice Pigott and Kimberly and Christopher Barnes have stipulated to the granting of Sanibel's motion for summary judgment concerning their fraud claims. (Doc. 94, at 18 n.13.) As such, the ILSFDA property report ruling in Section IV, *supra*, is dispositive of all claims by and between these five plaintiffs and Sanibel.

developers from employing any device, scheme or artifice to defraud in connection with the sale of a nonexempt lot.[40]  Their Amended Complaint alleges that the scheme or artifice to defraud stems from the fact that these three plaintiffs "believed and it was represented to them that they were making an Offer on a pre-development unit of Sanibel Condominiums." (Doc. 54, ¶¶ 36, 48.)  After entering into Purchase Agreements, these plaintiffs allege, they learned with respect to each unit "that their unit was in fact not a pre-development unit, but had been flipped prior to being offered as an available unit to" them.  (*Id.*, ¶¶ 39, 49.)  Sanibel seeks summary judgment on Counts Two and Three of Hersey/Priolet Amended Complaint on the grounds that there is insufficient evidence to create a material question of fact as to whether Sanibel defrauded these plaintiffs.  Hersey and the Priolets have not moved for summary judgment on these claims; rather, they contend that issues of material fact remain on their ILSFDA fraud causes of action. (Doc. 94, at 20.)

There is no evidence that Sanibel representatives ever informed Hersey or the Priolets that they were purchasing pre-development units.   In fact, Hersey expressly testified in her deposition that the only misrepresentation made to her in that regard was by non-party Mark Wysner of non-party Prudential Real Estate, and not a Sanibel representative.  (Hersey Dep., at 55.)  But plaintiffs' theory is simply this: Sanibel had an obligation to tell them that their units had already been sold to undisclosed third parties for a fraction of the price that plaintiffs were agreeing to pay, and that the difference in purchase prices (on the order of $200,000 for each unit) would go directly into those third parties' pockets.  The record bears out that both Hersey's unit and the Priolets' unit had previously been sold by Sanibel to third parties for a much lower price, and that the price differential would be diverted into the hands of those third parties at closing.  The record in the light most favorable to plaintiffs further bears out that Hersey and the

---

[40]        Indeed, in addition to the property report requirement, the ILSFDA provides that, with respect to the sale of any nonexempt lot, it is unlawful "to employ any device, scheme, or artifice to defraud" or "to engage in any transaction, practice or course of business which operates or would operate as a fraud or deceit upon a purchaser."  15 U.S.C. § 1703(a)(2)(A),(C). With respect to "the sale of lots in the subdivision that are not exempt ..., the developer must comply with the Act's anti-fraud provisions."  24 C.F.R. § 1710.6; *see also* 24 C.F.R. § 1710.14(c) (stating that sales subject to § 1710.14 regulatory exemptions must comply with anti-fraud provisions).

Priolets were unaware of this arrangement and were misled to their detriment as a result of Sanibel's omission of these material facts.  For its part, however, Sanibel insists that plaintiffs, as experienced and savvy real estate investors, had actual knowledge of these arrangements or were in possession of facts that should have placed them on notice of same.

Plaintiffs say this fraudulent concealment theory is viable under the ILSFDA.  Sanibel says it is not.  Neither party offers any meaningful citations of authority to support its position.  Despite the paucity of authority on the question, the Court agrees with plaintiffs based on the plain language of the statute.  Under ILSFDA, it is unlawful "to employ any device, scheme, or artifice to defraud," "to obtain money or property by means of ... any omission to state a material fact necessary in order to make the statements made (in light of the circumstances in which they were made and within the context of the overall offer and sale or lease) not misleading," or "to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon a purchaser."  15 U.S.C. § 1703(a)(2)(A) - (C).  The sort of omissions that Hersey and the Priolets ascribe to Sanibel could logically fit within any or all of these subparagraphs.  The Court therefore concludes that the material omission theory advanced by Hersey and the Priolets is actionable under the ILSFDA, and it is for the finder of fact to decide whether those plaintiffs were in fact defrauded in this manner.

**VI.    Conclusion.**

For all of the foregoing reasons, it is hereby **ordered** as follows:

1.    Plaintiffs' Motion to Strike (doc. 93) is **granted**.  All references to Units 404, 601, 703, 801, 805, 806, 1104, 1203 and 1801, as well as to Nabors, Burnett and Parks, are hereby **stricken** from the summary judgment record.

2.    Defendants' Motion for Summary Judgment (doc. 81) is **granted in part**, and **denied in part**.  The Motion is **granted** with respect to Count II (ILSFDA fraud) of the Amended Complaint (doc. 53) brought by Pigott and the Barneses, and that cause of action is hereby **dismissed**.  In all other respects, defendant's Motion for Summary Judgment is **denied**.

3.    Plaintiffs' Motion for Partial Summary Judgment (doc. 79) is **granted**.  Judgment will be entered in favor of Pigott, the Barneses, Hersey, the Priolets, Martino and

Taylor on their ILSFDA claims to rescind their respective Purchase Agreements based on Sanibel's failure to furnish them with a printed property report. The Purchase Agreements entered into between plaintiffs and Sanibel are **revoked**. Upon entry of a final judgment, defendant will be ordered to return all earnest money deposits and to release all letters of credit that it or its escrow agent may be holding in relation to these transactions. To the extent that those earnest money deposits or letter of credit proceeds are being held in the registry of this District Court, the final judgment will direct the Clerk of Court to release those funds to plaintiffs. Defendant's counterclaims for declaratory judgment against Pigott, the Barneses, Hersey, and the Priolets are **dismissed**.

4.  The ILSFDA fraud claims brought by Hersey and the Priolets against Sanibel remain pending and will proceed to trial. The Final Pretrial Conference in this action remains set for **October 7, 2008** at **11:00 a.m.**, with this action to be set for non-jury trial before the undersigned during the month of November 2008. (*See* doc. 60.)

5.  Because this Order adjudicates fewer than all the claims or rights and liabilities of fewer than all the parties, and because the Court cannot certify that there is no just reason for delay given the intertwined nature of the remaining claims and parties with the adjudicated claims and parties, entry of final judgment is inappropriate at this time. *See* Rule 54(b), Fed.R.Civ.P. Therefore, no final judgment will be entered in connection with the claims and rights adjudicated by this Order until such time as the remaining claims have been adjudicated.

DONE and ORDERED this 17th day of September, 2008.

s/ WILLIAM H. STEELE
UNITED STATES DISTRICT JUDGE